| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**Greenbaum, Rowe, Smith & Davis LLP**<br>Nancy Isaacson, Esq.<br>Thomas K. Murphy III, Esq.<br>75 Livingston Avenue<br>Roseland, New Jersey 07068<br>(973) 535-1600<br>nisaacson@greenbaumlaw.com<br>Attorneys for Nancy Isaacson, Chapter 7 Trustee | |
| In re:<br><br>**REVIVAL HOLDINGS, LLC,**<br><br>Debtor. | Chapter 7 Proceeding<br><br>**Case No. 22-19146 (VFP)** |
| **NANCY ISAACSON, CHAPTER 7 TRUSTEE,**<br><br>v.<br><br>**SACHS CAPITAL FUND II, LLC; SACHS CAPITAL PARTNERS, LLC; MICHAEL CANIZALES; BOB HENLEY; ANDREW SACHS and PETER MANNING,**<br><br>Defendants. | **Adv. Pro. No.:** |

## ADVERSARY COMPLAINT

Plaintiff, Nancy Isaacson, Chapter 7 Trustee (the "Trustee") for debtor, Revival Holdings,

LLC by way of adversary complaint against defendants, Sachs Capital Fund II, LLC; Sachs Capital

Partners, LLC, Michael Canizales, Bob Henley, Andrew Sachs and Peter Manning ("Defendants"),

respectfully says:

5723960.1

## PARTIES

1. Debtor, Revival Holdings, Inc. ("Revival Holdings") is a Delaware limited liability company with its principal place of business located at 78 Diamond Road, Springfield, New Jersey.

2. Revival Holdings is a manufacturer, reseller, and installer of custom windows, operating through three businesses: Revival Sash & Door LLC, Bright Window Specialists Inc., and Prelude, Inc. (d/b/a Sequel Glass).

3. On November 17, 2022, (the "Petition Date"), Revival Holdings filed a voluntary petition pursuant to Chapter 7 of the Bankruptcy Code.

4. On November 18, 2022, the Trustee was appointed as the Chapter 7 Trustee of Revival Holdings' bankruptcy estate and has continued to act in that capacity.

5. Revival Holdings is the sole member of Revival Sash & Door LLC ("Revival Sash"). On November 17, 2022, Revival Sash filed a voluntary chapter 7 petition under 11 U.S.C. § 101 et seq. in the United States Bankruptcy Court for the District of New Jersey under Case No. 22-19151 (VFP).

6. On November 18, 2022, Trustee was appointed as Revival Sash's chapter 7 trustee and continues to act in that capacity.

7. Revival Holdings is the sole member of Prelude LLC ("Prelude"). On November 17, 2022, Prelude filed a voluntary chapter 7 petition under 11 U.S.C. § 101 et seq. in the United States Bankruptcy Court for the District of New Jersey under Case No. 22-19147 (VFP).

8. On November 18, 2022, Trustee was appointed as Revival Sash's chapter 7 trustee and continues to act in that capacity.

9. Revival Holdings is the sole stockholder of Bright Window Specialists Inc. ("Bright Windows"). On November 17, 2022, Bright Windows filed a voluntary chapter 7 petition under

5723960.1

11 U.S.C. § 101 et seq. in the United States Bankruptcy Court for the District of New Jersey under Case No. 22-19150 (VFP).

10.    On November 18, 2022, Trustee was appointed as Bright Windows' chapter 7 trustee and continues to act in that capacity.

11.    Defendant, Sachs Capital Fund II, LLC ("SC Fund"), is a member of Revival Holdings and a signatory to Revival Holdings' Operating Agreement. SC Fund owns a majority of Revival's Class A Preferred Units. SC Fund is a limited liability company formed under Delaware law with offices at 10516 Tulip Lane, Potomac, Maryland 20854.

12.    Defendant, Sachs Capital Partners, LLC ("SC Partners"), is SC Fund's Managing Member. SC Partners signed Revival Holdings' Operating Agreement on behalf of SC Fund. SC Partners is a limited liability company formed under the laws of the State of Delaware with offices at 10516 Tulip Lane, Potomac, Maryland 20854.

13.    Defendant, Andrew Sachs ("A. Sachs"), was, at all times relevant to the claims brought herein, a member of Revival Holding's Board of Managers. A. Sachs is SC Partners' Manager, which, as previously noted, serves as SC Fund's Managing Member. A. Sachs, SC Fund and SC Partners are referred to collectively as (the "Sachs Defendants."). A. Sachs resides at 10516 Tulip Lane, Potomoc, MD 20854

14.    Defendant, Michael Canizales ("Canizales"), is Revival Holdings' CEO. He also is a member of the Board of Managers. Canizales is the principal of Silver Lining LLC, which also is a member of Revival Holdings. Canizales resides at 7650 NE 7th Avenue, Boca Raton, Florida 33487.

15.    Defendant, Robert Henley ("Henley"), is an "Operating Partner" of SC Partners, a member of the Board of Managers, and, at the Sachs Defendants' behest, was an outside financial

5723960.1

and auditing consultant to Revival Holdings hired and compensated by the Sachs Defendants. Henley resides at 1900 Sycamore Spring Court, Cooksville, MD 21723.

16.    Defendant, Peter Manning ("Manning"), is a member of the Board, a founder of Revival Holdings. As described herein, Manning aided and abetted and conspired with Canizales to ensure the Sachs Defendants gained control of Revival Holdings which led directly to its insolvency. Manning resides at 68 Sachuest Way, Middletown, RI 02842.

## JURISDICTION AND VENUE

17.    Pursuant to 11 U.S.C. § 704, the Trustee is authorized to investigate and pursue all appropriate claims and causes of action against the Revival Holdings' directors and officers.

18.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b)(1) and 1334(b).

19.    All of the Defendants are subject to personal jurisdiction in  New Jersey because they were, at all relevant times, directors or officers of Revival Holdings, a Delaware limited liability company with its principal place of business located in Springfield, New Jersey, and they all personally carried out their responsibilities as directors and officers while being physically present in New Jersey at various times.

20.    This matter is a non-core proceeding, which this Court may hear pursuant to 28 U.S.C. § 157(c)(1) because it is otherwise related to Revival's bankruptcy case under title 11.

21.    Venue in this District is proper pursuant to 28 U.S.C. § 1409(a) because this proceeding arises under title 11 or arises in or is related to a bankruptcy case under title 11 that is pending in the District of New Jersey.

## FACTS COMMON TO ALL COUNTS

### I.    BACKGROUND

5723960.1

22.     This is an action for damages against Defendants arising from Defendants' breach of their fiduciary duties, breach of loyalty which was in breach of the subject operating agreement which resulted in a waste of corporate assets.

23.     Among other improper actions, the Defendants caused or allowed Revival Holdings to enter into nine unauthorized loans ("Unauthorized Loans") which resulted in Revival Holdings and its subsidiaries and affiliated corporations and entities to becoming insolvent.

24.     Upon information and belief, non-party George Cannon ("Cannon"), Canizales, Manning and non-party Brian Trager ("Trager") founded Revival Holdings' predecessor, Revival Sash in or about July 2017.

25.     Revival Sash, a custom manufacturer of residential doors and windows, merged with Bright Window, a dealer and installer of doors and windows, in 2018, and renamed the combined entity Revival Holdings.

*a. Operating Agreement and the Revival Holdings Board*

26.     The founding members executed the initial Operating Agreement on or about September 24, 2018.

27.     Revival Holdings has a Board of Managers (the "Board") whose authority and actions are governed by the initial Operating Agreement and any amendments thereto (the "Operating Agreement").

28.     Revival Holdings' Board was comprised of Canizales, Manning and Henley.

29.     The Operating Agreement prohibited Revival Holdings from entering into any loans with any Revival member without Board approval.

30.     Specifically, Section 2.08 of the Operating Agreement states the following:

> Subject to the terms of this Agreement (including, without limitation, Section 4.03) and without in any way limiting the authority of the Board to

cause the Company to borrow funds from a non-Affiliated third party (instead of, or in addition to, any loan(s) of the type contemplated by this Section 2.08), any Member or Affiliate of a Member may, with the consent of the Board, lend or advance money to the Company.  If a Member shall make any loan(s) to the Company or advance money on its behalf, the amount of such loan(s) or advance(s) shall not be treated as a Capital Contribution to the Company and shall not increase such Member's Capital Account but shall instead be treated as a debt due from the Company to a creditor as to all parties and as for all purposes to the fullest extent permitted by law.  Any such loan shall be a debt of the Company to such Member and shall be payable or collectible only out of the Company's property in accordance with the terms and conditions upon which such loan was made and shall bear interest at a rate at least equal to the prime rate quoted in the Wall Street Journal as of the date such loan was made unless such requirement is waived by the Board.

31.     Under the Operating Agreement, the Class A Units, Class B Units and vested Class C Units had voting rights and voted together in a single class (except in cases where the Class A units were entitled to vote as a separate class).

32.     In connection with the growth of Revival Holdings and the expansion of its business, Revival Holdings established a Profits Interest Plan to create long-term incentives for certain members of management by providing for the issuance of Class C Incentive Units and Class D Promote Units pursuant to the terms and conditions set forth in the Operating Agreement and related ancillary agreements.

33.     Section 7.05 of the Operating Agreement addressed the obligations of the Board in addressing a conflict situation. In the event of any conflict of interest, the full Board was to vote on a course of action to ensure fairness and the semblance of an arms- length transaction.

*b. Class A Preferred Membership Unit Purchase Agreement*

34.     On or about May 3, 2019, a Class A Preferred Membership Unit Purchase Agreement was executed in which the purchasers invested $6,300,000 in Revival Holdings in exchange for Class A Preferred Units. Subsequently, in November 2019, SC Fund purchased Class

5723960.1

A preferred Units issued by Revival Holdings. These transactions were recorded in a Class A Unit Purchase Agreement and an Amendment to the Class A Purchase Agreement (together, the "Class A Purchase Agreement').

*c. Management Agreement with Bright Window and Revival Sash*

35.     On or about May 3, 2019, a Management Agreement was executed for Bright Windows and Sash whereby Revival Holdings was to pay to Manager an annual management fee of Two Hundred Thousand Dollars ($200,000) (the "Management Fee"). The Management Fee shall be payable in arrears semiannually, in installments of One Hundred Dollars ($100,000), with the first payment due on the date that is six months from the date of this Agreement.

**The Sachs Defendants and Canizales Violate the Operating Agreement's Protections and Issued Notes Without Board Notice or Approval**

36.     On or about November 10, 2019, the Sachs Defendants presented terms for a proposed $2,500,000 line of credit to be arranged with the Sachs Defendants' limited partners and an existing Class B Unitholder. The existing Class B Unitholder—SC Fund—was to act as Manager for "Revival LOC LLC" ("R-LOC"), the entity through which the credit line would be arranged.

37.     SC Partners received a $30,000 fee upon closing and $2,500 per month thereafter.

38.     This line of credit closed on January 16, 2020.

39.     Nonetheless, as later admitted in a nonetheless-otherwise false and misleading August 2020 Information Statement, from December 2019 through July 2020, Canizales and the Sachs Defendants, without Board approval, caused Revival Holdings to enter into the Unauthorized Loans with the Sachs Defendants, lending Revival Holdings a total aggregate principal amount of $1,605,000.

40.     Issuance of the Unauthorized Loans violated Section 2.08 of the Operating

Agreement, the provision that forbade loans from any member without Board notice and approval.

41.    Some of these loans had annualized interest rates that were astoundingly as high as 60%.

42.    Issuance of the Unauthorized Loans violated the Operating Agreement which forbade loans from any member without Board notice and approval.

43.    Further, in each of the Unauthorized Loans, Canizales and the Sachs Defendants violated Operating Agreement which required a process of consideration by the Board as to whether any conflicted transaction was on terms that are no less favorable than could reasonably be obtained by Revival Holdings from unaffiliated persons in an arm's length transaction under similar arrangements and under similar circumstances, and any customary or generally accepted industry practices.

44.    Upon information and belief, the Sachs Defendants have admitted at times in sworn testimony in other legal proceedings that their intent from the beginning was to convert the Unauthorized Loans to equity.

45.    Canizales and A. Sachs negligently and grossly negligently caused Revival Holdings to execute Unauthorized Loans with the Sachs Defendants even after R-LOC's credit line was available for draw down.

46.    Upon information and belief, on April 10, 2020, for example, Revival Holdings received a wire for $175,000 from SC Fund. Yet on April 23, 2020, Revival Holdings received a wire for $500,000 from R-LOC. This series of transactions demonstrates that the Sachs Defendants advanced funds to Revival Holdings at a shocking and indefensible 60% annual interest at a time when there was at least $500,000 available to draw under Revival's line of credit

5723960.1

at 10% annual interest from the R-LOC which A. Sachs controls via SC Partners.

**The Sachs Defendants Assert Control Over Revival**

47.     As a requirement of its November 2019 investment, A. Sachs installed Henley as an outside advisor reporting to the CEO in connection with developing and refining processes, systems, and financial reporting.

48.     A. Sachs represented that Henley would provide the Sachs Defendants with additional assurance that Revival Holdings' financials were reported properly.

49.     The Sachs Defendants compensated Henley for the work he performed for Revival Holdings, and, upon information and belief, as the CFO of Revival holdings, Henley received compensation solely from Sachs Capital.

50.     Henley's role quickly expanded, and he began controlling all information flow to the Revival Holdings' auditors and overseeing Revival Holdings' financial reporting.

51.     Through Henley, and the leverage they obtained through the Unauthorized Loans, the Sachs Defendants seized effective control over Revival Holdings operations.

52.     As time passed, Canizales became increasingly beholden to the Sachs Defendants.

53.     Canizales derived his principal employment and substantial compensation from Revival Holdings as both Manager and CEO.

54.     That was not the only form of leverage the Sachs Defendants enjoyed over Canizales. Specifically, Canizales' spouse, Harris Mylonas ("Mylonas"), also derived his principal employment and substantial compensation from Revival.

55.     Indeed, at the time, Canizales earned at least $300,000 per year as CEO of Revival Holdings. That compensation was, and is, on information and belief, Canizales's primary source of income. Canizales' spouse Mylonas earns at least $100,000 per year from Revival Holdings

as his primary source of income. Both sets of payments are material to Canizales. Additionally, on information and belief, together Canizales and Mylonas were owed in excess of $300,000 in accrued compensation at the time of the Information Statement.

56. Under the Operating Agreement, were Canizales to die, resign, become disabled, or be removed, his spouse Mylonas automatically was to fill that vacancy.

57. Likewise, Henley is beholden to the Sachs Defendants, who paid his compensation, and continued to work with him in other capacities. Henley is an "Operating Partner" of SC Partners and earns substantial sums of money in that role, including, upon information and belief, at least $100,000 in connection with his role at Revival Holdings at the Sachs Defendants' behest.

58. Manning's independence was also compromised  because the Sachs Defendants paid substantial sums of money to Manning, including paying for his New York City apartment and his son's fees for video marketing work.

59. As a direct and proximate result of these arrangements, the Sachs Defendants exercised significant control over Revival Holdings' affairs and ensured the loyalty of Canizales, Henley and Manning.

60. Throughout this time, Henley and Manning conspired with Canizales and A. Sachs to act in the Sachs Defendants' interest and in a manner that was detrimental to Revival Holdings.

**The Sachs Defendants Right to a "True Up" under the Class A Purchase Agreement**

61. A central tool the Sachs Defendants used in their scheme to secure additional equity and control in Revival Holdings was their attempts to exploit (and misrepresent) their rights to an equity adjustment based upon 2019 EBITDA, notwithstanding that the Sachs Defendants had surrendered their rights to do so.

5723960.1

62.    The Class A Purchase Agreement provides for an "Additional Equity Issuance" to SC Fund in the event an audit of Revival's 2019 Income Statement (the "Audit') is conducted and said audit concludes that certain EBITDA hurdles have not been satisfied.

63.    The Class A Purchase Agreement sets forth a formal process and date by which an Audit must be conducted, delivered, and presented to the Sachs Defendants.

64.    The Class A Purchase Agreement also sets forth a specific methodology by which EBITDA is to be calculated based upon values contained in the Audit (the "EBITDA Process').

65.    Between November 2019 and March 2020, the Sachs Defendants and Canizales schemed and took substantial steps intended to ensure an Audit was not conducted and, co-extensively, the EBITDA Process could not be followed.

66.    Indeed, with Henley's installation and his subsequent ownership over the Audit process, the Sachs Defendants, not Revival Holdings, became responsible for causing Revival' Holdings' accountants to complete the Audit of the financial statements that would be used for the true-up.

67.    In fact, neither the Sachs Defendants nor the Board made any attempt: to revise or further amend the Class A Purchase Agreement; or enforce the True-up in accordance with terms of the Class A Purchase Agreement despite the Sachs Defendants' repeated claim to such a right.

**Sachs Initial Capitalization Proposal and Threat of True Up**

68.    On or about, June 5, 2020, A. Sachs emailed a "Capitalization Proposal" for Revival to all Unitholders of Revival (the "Sachs Initial Proposal").

69.    The Sachs Initial Proposal purported to: (a) convert $1,325,000 of notes then-held by the Sachs Defendants into Class A Preferred Units; (b) change the terms of all Class A Units to "Participating Preferred" with changes to "voting rights,"; (c) issue new Class A Units to the Sachs

5723960.1

Defendants; (d) issue new Class E Units constituting 30% of total equity to be given to Revival Holdings' senior management team; (e) strip Class B Units of their Board representation and unique and valuable Board appointment rights; (f) propose that Canizales represent Class E Units on the Board; (h) propose that Manning represent Class E Units; (i) propose that Henley represent Class A Units; and (j) repay accrued management compensation ahead of lenders who had lent Revival Holdings cash.

70.     The Sachs Initial Proposal contained several materially false and misleading claims, as well as omission of material facts.

71.     Upon information and belief, A. Sachs further threatened that, if the Sachs Initial Proposal were not adopted, the Sachs Defendants would seek a true-up based on 2019 Adjusted EBITDA.

72.     Specifically, A. Sachs wrote: "Preferred's ownership position has to be determined per the investment agreement if Sachs alternative proposal is not adopted."

73.     All Defendants knew, or deliberately, recklessly, and grossly negligently ignored that under A. Sachs's and Henley's direction, the Sachs Defendants had taken actions to prevent the true-up process from being followed.

74.     On information and belief, A. Sachs also intentionally omitted disclosing to Revival Holdings' Unitholders that he himself had voted against performing a true-up based on 2019 Adjusted EBITDA.

75.     The Sachs Initial Proposal was specifically planned, drafted, designed, and issued by A. Sachs, with Defendants' knowledge, to frighten already nervous investors into believing that Revival Holdings was in dire financial circumstances and that the Unauthorized Loans were necessary.

76.    At the time the Sachs Initial Proposal was presented, all Defendants knew, or deliberately, recklessly, grossly negligently or negligently ignored that Revival was already on its way to achieving 63.3% of the revised revenue forecast in the first six months of the year—despite the Covid-19 shut down and any of the other ancillary actors A. Sachs falsely claimed had negatively impacted Revival Holdings' performance.

**The Sachs Defendants Unfairly Leverage their Unauthorized Loans**

77.    Upon information and belief, between February 2020 and July 2020, additional Unauthorized Loans were issued.

78.    The Sachs Defendants used the Unauthorized Loans' existence and their default, or near default, status as leverage in their efforts to obtain more equity in Revival Holdings.

79.    Upon information and belief, in or about June 2020, A. Sachs stated that, if the Sachs Defendants received additional equity, he would arrange to convert the Unauthorized Loans into equity rather than demand repayment or call a default.

80.    Upon information and belief, in or about June 2020, Canizales stated he supported the Sachs Defendants' effort to obtain additional equity.

**Sachs and Canizales Secure an Amended Operating Agreement by Offering Nonratable Benefits and Misleading the Unitholders**

81.    On August 27, 2020, Revival distributed an Information Statement (the "Information Statement") to Unitholders detailing a plan for new unit issuances to the Sachs Defendants, Canizales, Manning, Trager, and others, while materially diluting the Class B Units that existed in the then-current Operating Agreement (the "Amendment").

82.    Like the Sachs Initial Proposal, the Information Statement which was drafted by the Sachs' Defendants' Counsel contained numerous false or misleading statements and omissions of fact.

5723960.1

83.     The false and misleading statements in the Information Statement included the terms of the Unauthorized Loans were fair and that they were the best available to Revival Holdings even though the interest rate was approximately 60% annually.

84.     By the terms of the Information Statement, if the Amendment were adopted, the Sachs Defendants would convert $1,325,000 of their aggregate unpaid principal note balances into additional Class A Units.

85.     On information and belief, converting the Unauthorized Loans and related restructuring increased Class A Unitholders' ownership of Revival Holdings from 32.3% to 78.865% and ultimately contributed to Revival Holdings becoming insolvent.

## COUNT I
### (Breach of Fiduciary Duty of Care Against Canizales as CEO)

86.     The Trustee repeats and re-alleges the allegation set forth in the above paragraphs as if fully set forth herein.

87.     The Operating Agreement expressly imposes upon Canizales fiduciary duties with respect to his actions as a Revival Holdings' officer.

88.     Canizales breached those duties by participating in the scheme that would permit Defendants to gain the authority and control necessary to enter into several to  loans to the severe detriment and ultimate insolvency of Revival Holdings and its subsidiaries Revival Sash, Prelude and Bright Windows.

89.     Completion of the scheme would not have been possible without Canizales taking several key acts in his role as a Revival Holdings officer, including:

> (a) Executing the overpriced Unauthorized Loans to the Sachs Defendants in contravention of the Operating Agreement's clear provisions;

> (b) Offering non-ratable benefits to certain Class B Unitholders to secure

the support of certain of those investors;

(c) Destroying Revival Holdings' records documenting the concerns Cannon expressed about these issues;

(d) Presenting misleading financial information to Unitholders in the Information Statement, and failing to correct such information; and

(e) Presenting inaccurate information in the Information Statement about the ability of Sachs Defendants to obtain a true-up based upon Revival Holdings' 2019 financials, which ability the Sachs Defendants had waived.

90.    Based on the foregoing, Canizales breached the fiduciary duties of both loyalty and care that he owed to Revival Holdings and anyone with an interest in Revival holdings.

91.    As a direct and proximate result of such illegal and impermissible and bad faith accessorial conduct, including dilution of minority Unitholder interests, Revival Holdings has been damaged.

**WHEREFORE,** the Trustee respectfully requests that this Court enter judgment on Count I against Canizales, in an amount equal to the total damages suffered by Revival Holdings and its creditors as a result of the Canizales' negligence, breaches of his fiduciary duty of care, plus interest, costs and attorneys' fees.

## COUNT II
### (Breach of Fiduciary Duty of Care Against All Defendants)

92.    The Trustee repeats and re-alleges the allegation contained in the above paragraphs as if fully set forth herein.

93.    The Sachs Defendants, through their principal, A. Sachs, had knowledge of the ongoing breaches of fiduciary duty of Canizales detailed in Count I above.

94.    The Sachs Defendants, Henley, and Manning each had knowledge of the ongoing breaches of fiduciary duty of Canizales.

95. The Sachs Defendants, Henley, and Manning each used their knowledge of Canizales' breaches of fiduciary duty as CEO owed to Revival Holdings to gain unfair advantages and benefits knowing or deliberately, recklessly, grossly negligently or negligently ignoring that such advantages were a direct result of those breaches.

96. Henley was well aware of the scheme not to perform the Audit that was required for the true up.

97. Henley also prepared the misleading financial statements contained in the Information Statement.

98. Upon information and belief, Henley did so at the behest of Canizales and A. Sachs.

99. The Defendants acted in concert and pursuant to a common design, agreement, scheme, or plan to effectuate Canizales's wrongful acts in furtherance of their ongoing scheme.

100. Each of the Defendants entered into an agreement to perform an illegal act in the form of causing and encouraging Canizales to approve the Unauthorized Loans, and thereafter ratify them, or, alternatively, agreed to perform putatively legal acts in an illegal manner.

101. Alternatively, each of Canizales, the Sachs Defendants, Henley, and Manning knew or deliberately or recklessly ignored that each other's conduct was a breach of their duties Revival Holdings, but nonetheless gave each other substantial assistance and encouragement so as to conduct themselves and accomplish tortious results.

102. Alternatively, each Defendant provided substantial assistance to each other in accomplishing tortious results, and each of their own conduct, separately considered, constituted a breach of duty to Revival Holdings. Such substantial assistance included without limitation: (a) facilitating Revival Holdings' entry into the unfair, overpriced Unauthorized Loans; (b) making

and distributing false and misleading written and verbal statements, including the Information Statement; (c) falsely casting Canizales' role and actions as those of a "member" or "manager" rather than as CEO simply to enable him to avoid fiduciary liability exposure; (d) bribing other members with non-ratable benefits to obtain their vote in order to dilute Revival Holdings' enterprise value generally; and (e) ratifying the Unauthorized Loans.

103.    As a direct and proximate result of such illegal, impermissible and bad faith accessorial conduct, including dilution of minority Unitholder interests, Revival Holdings has been damaged.

**WHEREFORE,** the Trustee respectfully requests that this Court enter judgment on Count II against all Defendants, jointly and severely, in an amount equal to the total damages suffered by Revival Holdings and its creditors as a result of the Defendants' breaches of their fiduciary duty of care, plus interest, costs and attorneys' fees.

## COUNT III
### (Breach of Duty of Loyalty Against All Defendants)

104.    The Trustee incorporates by reference the allegation set forth above as if fully recited herein.

105.    As directors and officers of Revival Defendants owed both Revival and its creditors a duty of loyalty, which required them to perform their directorial and official obligations in good faith and with a view toward solely promoting the interests of Revival Holdings and its creditors and not for their own interests and gains.

106.    Defendants breached their duty of loyalty by participating in the scheme to dilute Class B Unitholders for Defendants to gain the authority and control necessary to enter into several improper loans to the severe detriment of Revival Holdings.

107.    As a direct and proximate result of such illegal and impermissible and bad faith

accessorial conduct, including dilution of minority Unitholder interests, Revival has been damaged causing Revival Holdings and its subsidiaries and affiliated corporations and entities to become insolvent.

**WHEREFORE,** the Trustee respectfully requests that this Court enter judgment on Count III against all Defendants, jointly and severely, in an amount equal to the total damages suffered by Revival Holdings and its creditors as a result of the Defendants' breaches of their fiduciary duty of loyalty, plus interest, costs and attorneys' fees.

## COUNT IV
### (Breach of Fiduciary Duty – Waste of Corporate Assets Against Canizales as CEO)

108.  The Trustee incorporates by reference the allegation set forth above as if fully recited herein.

109.  As CEO of Revival Holdings, Canizales had a duty to protect Revival Holding's assets from loss or waste.

110.  By enabling the Sachs Defendants to impose the onerous and financially draining Unauthorized Loans upon Revival Holdings in derogation of the specific requirements set forth in the Operating Agreement, and thereafter enabling the Sachs Defendants to expel Cannon from the Board and thereafter ratify the loans effectively through Canizales's unilateral approval, Canizales breached his duties and caused Revival to waste its assets, including enabling the Sachs Defendants to seize far more leverage over Revival Holdings' equity and business decisions absent the Unauthorized Loans.

111.  Canizales's enabling of the Unauthorized Loans and later ratification thereof did not constitute an exercise of reasonable professional business judgment and was instead intended to serve each Defendant's selfish interest in maintaining their lucrative financial relationship with the Sachs Defendants by any means necessary.

5723960.1

112.    As a direct and proximate result of such unjustifiable corporate waste, Revival Holdings has been damaged in an amount to be determined at trial.

**WHEREFORE,** the Trustee respectfully requests that this Court enter judgment on Count IV against Canizales, in an amount equal to the total damages suffered by Revival Holdings and its creditors as a result of the Canizales' breaches of his fiduciary duties and waste of corporate assets, plus interest, costs and attorneys' fees.

<u>**COUNT V**</u>
**(Breach of Fiduciary Duty – Waste of Corporate Assets Against All Defendants)**

113.    The Trustee incorporates by reference the allegation set forth above as if fully recited herein.

114.    The Sachs Defendants, through their principal, A. Sachs, had knowledge of the corporate waste detailed in Count IV above.

115.    The Sachs Defendants, Henley, and Manning each had knowledge of the corporate waste facilitated by Canizales as a result of the Unauthorized Loans.

116.    The Sachs Defendants, Henley, and Manning each used their knowledge that Canizales had caused Revival to waste its corporate assets so that Canizales and his cronies could gain unfair advantages and benefits knowing or deliberately, recklessly, or negligently ignoring that such advantages were a direct result of Canizales's breaches of fiduciary duty, which in turn had caused Revival Holdings to waste its corporate assets by entering into overpriced and harmful Unauthorized Loans that had a dilutive impact upon Revival and its Unitholders.

117.    Henley also prepared misleading financial statements and other documentation that resulted in the Unauthorized Loans' ratification.  Upon information and belief, Henley did so at the behest of Canizales and A. Sachs.

118.    The Defendants acted in concert and pursuant to a common design,

5723960.1

agreement, scheme, or plan to effectuate Canizales's wrongful acts in furtherance of Defendants' ongoing scheme to waste Revival's corporate assets.

119.    Each of the Defendants entered into an agreement to perform an illegal act in the form of causing and encouraging Canizales to approve the Unauthorized Loans, and thereafter ratify them, or, alternatively, agreed to perform putatively legal acts in an illegal manner.

120.    Alternatively, each of Canizales, the Sachs Defendants, Henley, and Manning knew or negligently ignored that each other's conduct was a breach of their duties to Revival Holdings, but nonetheless gave each other substantial assistance and encouragement so as to conduct themselves and accomplish tortious results by causing Revival to waste its corporate assets and enter into the Unauthorized Loans.  Such substantial assistance included without limitation: (a) facilitating Revival Holdings' entry into the unfair, overpriced Unauthorized Loans; (b) making and distributing false and misleading written and verbal statements, including the Information Statement in order to convince investors that the Unauthorized Loans were appropriate; (c) falsely casting Canizales's role and actions as those of a "manager" or "member" rather than as CEO simply to enable him to avoid fiduciary liability exposure as a result of his causing Revival Holdings to enter into the Unauthorized Loans; and (d) ratifying the Unauthorized Loans.

121.    Alternatively, each Defendant provided substantial assistance to each other in accomplishing tortious results, and each of their own conduct, separately considered, constituted a breach of duty to Revival Holdings and caused Revival Holdings to waste its corporate assets by entering into the Unauthorized Loans.

122.    As a direct and proximate result of such negligent, illegal, impermissible and bad faith accessorial conduct, including dilution of minority Unitholder interests, Revival

5723960.1

Holdings has been damaged.

**WHEREFORE,** the Trustee respectfully requests that this Court enter judgment on Count V against all Defendants, jointly and severally, in an amount equal to the total damages suffered by Revival Holdings and its creditors as a result of the Defendants' breaches of their fiduciary duties and waste of corporate assets, plus interest, costs and attorneys' fees.

Dated: January 28, 2023

Respectfully submitted,

**GREENBAUM, ROWE, SMITH& DAVIS LLP**
(Counsel to Trustee Nancy Isaacson)

By:   */s/ Nancy Isaacson*
         Nancy Isaacson, Esq.

5723960.1